**Anomi R. URSETH, Plaintiff,**

v.

**CITY OF DAYTON, OHIO, et al, Defendants.**

No. C–3–84–103.

United States District Court, S.D. Ohio, W.D.

May 5, 1986.

On Motion to Compel Medical Authorizations
May 8, 1986.

Motion to Amend Protective Order
May 23, 1986.

E. John Wist, A. Melvin Kemmer, Tipp City, Ohio, Irving Saul, Dayton, Ohio, for plaintiff Urseth.

William Thornburgh, Dayton, Ohio, for plaintiff Price.

Neil F. Freund, Dayton, Ohio, for defendant City of Dayton and Broomfield.

Victor A. Hodge, Dayton, Ohio, for defendants Reynolds and Holland.

Dennis Lieberman, Dayton, Ohio, for defendants Navarre and Chabali.

Philip B. Herron, Dayton, Ohio, for defendant Varvel.

Robert J. Surdyk, Dayton, Ohio, John Adams, Kettering, Ohio, William Havemann, Dayton, Ohio, for defendant City of Kettering.

Howard Krisher, Dayton, Ohio, for defendants Czisma and Shaw.

Jeffrey Hazlett, Dayton, Ohio, for defendant Shows.

## DECISION AND ENTRY ORDERING DISCLOSURE OF DOCUMENTS SUBMITTED BY DEFENDANT CITY OF DAYTON FOR *IN CAMERA* REVIEW (DOC. # 104); CONFERENCE IN CHAMBERS SET

RICE, District Judge.

This case arises from the shooting death of Plaintiff's decedent, James H. Urseth, during the execution of a search warrant by certain City of Dayton and City of Kettering police officers on October 7, 1983. Plaintiff, the surviving spouse of James H. Urseth and the administratrix of his estate, has filed a civil rights lawsuit under 42 U.S.C. § 1983 against the individual police officers involved in the raid, the supervisor of the City of Dayton police officers, the Dayton Chief of Police, the City of Dayton, and the City of Kettering. Plaintiff has also invoked the pendent jurisdiction of this Court for her wrongful death action.

On March 19, 1986, the Court issued a ruling on certain discovery motions which had been filed by the parties. The Court agreed with Defendants Broomfield and City of Dayton that Plaintiff was not entitled, without a showing of "particularized need," to discovery of materials in the possession of a Special Grand Jury. (Doc. # 95, at 10–12). The Court disagreed with Defendant City of Dayton that internal police files sought by Plaintiff were insulated from discovery by an executive privilege for internal affairs materials. Production

of the factual portions of the internal police files—which included the Homicide Division report concerning the death of James H. Urseth, witness statements, etc.—was ordered by the Court. (Doc. # 95, at 15–20). The Court also ordered the production by Defendant City of Dayton of evaluative summaries prepared by internal police sources unless, as to each particular document for which the executive privilege for internal affairs was claimed, Defendant City of Dayton could make a showing that the confidentiality of such a document was vital to the decision making processes of the Dayton Police Department or that disclosure of such a document to Plaintiff would otherwise substantially harm the public interest. (Doc. # 95 at 23).

Defendant City of Dayton indicates that in excess of 7,000 pages of documents, including numerous evaluative summaries, have been produced or will be produced to Plaintiff (Doc. # 103). The City does, however, now seek a protective order which would allow it to withhold from discovery three multi-page documents pertaining to the firearms hearing held in the matter of James H. Urseth. Firearms hearings, Defendant indicates, are intended to be the fora for critical analyses by the Dayton Police Department of the performance of its own officers. Disclosure of firearms committee materials, in the view of the City, could only chill the important self-criticism which is the aim of those hearings. Defendant City of Dayton thus seeks to shield the following materials from discovery by Plaintiff:

(1) The transcript of the November 11, 1983 Firearms Hearing held in the matter of James H. Urseth, with voting Firearms Committee members Lt. Col. W.P. Riley (Chair), Mayor D.E. Tobias, and Lt. T.A. Tunney present;

(2) The Jan. 10, 1984 memorandum prepared by Lt. C.E. Waymire for Chief of Police Broomfield, summarizing the conclusions of the Firearms Committee after the Firearms Hearing held with respect to James H. Urseth; and

(3) A report labelled "Mayor D.E. Tobias/Firearms Hearing Board/James H. Urseth/November 11, 1983", which contains the internal affairs investigation into the shooting of James H. Urseth.

██ The third document described above, the Tobias report, does not require overly-great attention. The City indicates that this document has already been produced to Plaintiff, in all factual aspects, in the form of the full Internal Affairs report on the homicide of James H. Urseth (Doc. # 103). Upon scrutiny of this document by the Court, it appears to be a selection of factual materials from the Internal Affairs report which was prepared as background or assistance for a member of the Urseth Firearms Committee. Even assuming that discovery should not invade the firearms hearing process, neither the contents of this report nor its particular connection with the Urseth Firearms Hearing is such as to warrant its insulation from discovery. Accordingly, no protective order will be issued with respect to this document, and it should be produced to Plaintiff forthwith.

Disclosure of the two remaining documents before the Court presents a thornier question. The Firearms Committee's mission was to examine three areas: (1) whether the shooting of James H. Urseth complied with the Firearms Policy of the Dayton Police Department; (2) whether the existing Firearms Policy required revision; (3) whether additional training of Dayton police officers was required. The transcript of the Firearms Hearing reveals that the facts of the October 7, 1983 shooting were presented to the Committee members, and that a free-form, free-flowing discussion then ensued. This discussion allowed the Committee members to trade evaluations of police conduct on the date in question, and to determine whether remedial steps were necessary. The memorandum by Internal Affairs Commander Waymire to Chief Broomfield, after a brief summary of the facts, spells out in detail the Committee's answers to the three questions posed. It also puts forward comments and suggestions made by the Committee members, both collectively and individually.

## A. PROTECTION OF SELF–EVALUATIVE MATERIALS

None of the cases cited by this Court in its March 19 opinion actually applied the confidentiality standard fashioned to discern whether evaluative summaries prepared by internal police sources should be disclosed to civil rights plaintiffs. There are a number of cases, however, arising in slightly different contexts, in which courts have found an *ad hoc* qualified privilege for various kinds of confidential self-evaluation. *See Westmoreland v. CBS, Inc.*, 97 F.R.D. 703, 705 (S.D.N.Y.1983) (collecting cases). The most often-cited of these cases, and perhaps the most relevant herein, is *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C.1970), *reconsidered and aff'd*, 51 F.R.D. 187 (D.D.C.1970), *aff'd without opinion*, 479 F.2d 920 (D.C.Cir. 1973), which involved a hospital's evaluation of its clinical practices. In *Bredice*, which was a malpractice action, the plaintiff had sought the minutes and reports of a medical staff committee whose sole objective was the improvement of available care and treatment at the hospital based upon a thorough review, analysis and evaluation of the clinical work of staff members. 50 F.R.D. at 250. The meetings did not concern themselves with the care of patients who were currently in the hospital, but were in the nature of a retrospective review of the effectiveness of certain medical procedures which had been performed by staff members. The *Bredice* court found an "overwhelming public interest in having those staff meetings held on a confidential basis so that the flow of ideas and advice can continue unimpeded." *Id.* at 251. The court concluded further that to subject these discussions and deliberations to the discovery process, "without a showing of exceptional necessity," would result in terminating such deliberations, thus harming the public interest. *Id.* at 250. Accordingly, the court concluded that plaintiff was not entitled to production of this medical staff committee's minutes and reports. *Id.*

Two cases which further developed the rationale in *Bredice* are also helpful to this Court's analysis in the instant case. In *Gillman v. United States*, 53 F.R.D. 316 (S.D.N.Y.1971), a suit brought under the Federal Torts Claim Act, plaintiff's decedent had committed suicide in a federally controlled mental hospital. Plaintiff then sought production of the report of a board of inquiry which had been set up by the director of the institution after the suicide of plaintiff's decedent. The purpose of this board of inquiry was to determine whether there was a need to take any disciplinary action against any of the staff because of the incident and whether steps were to be taken to change the mental hospital's procedures to prevent another such suicide. *Id.* at 318. The *Gillman* court agreed with *Bredice* in finding that confidentiality of the board of inquiry's proceedings was essential in order to ensure candid and conscientious evaluation of clinical practices, and that such constructive professional criticism would not occur in an atmosphere where it was believed that statements made in such free-wheeling exchanges could later be used in litigation. *Id.* The *Gillman* court felt, however, that no such chilling effect would occur if disclosure of *factual* [as opposed to evaluative] materials from the board of inquiry's report were made available to plaintiff. Accordingly, statements describing the suicide itself, gather by the board of inquiry from hospital personnel, were allowed to be produced to the plaintiff. *Id.* at 319.

In *Davidson v. Light*, 79 F.R.D. 137 (D.Colo.1978), another malpractice case, plaintiffs sought the report of an Infection Control Committee which had met to discuss, as part of plaintiff's care while admitted to the hospital, the source of plaintiff's infections and the attempts of the staff to control the spread of that infection. *Id.* at 139. The *Davidson* court specifically

found that the Infection Control Committee dealt with the specific problem of infections, and that its purpose was *not* to formulate or review hospital policies in general. Given this functional distinction as to the role of the committee from that at issue in *Bredice*, as well as the fact that there had already been some disclosure of the Infection Control Committee's activities to the plaintiff, the *Davidson* court ordered disclosure of the Infection Control report to the Plaintiff. *Id.* at 140–141.[1]

## B. EXCEPTIONAL CIRCUMSTANCES REQUIRING DISCLOSURE HEREIN

This Court, like the courts in the foregoing cases, places considerable value upon the self-critical efforts of an institution performing a function essential to public health or safety. The public's interest in self-evaluation by the Dayton Police Department is beyond doubt. The Court agrees with Defendant City of Dayton that it is counter-productive to create the spectre that opinions expressed in frank and open firearms hearings are potential admissions against interest or admissions by a party opponent which may later be aired in court. In order to preserve this important vehicle for self-evaluation, participating police department supervisors must be allowed to engage in the type of free-flowing exchange of ideas which can lead to honest reflection and considered re-evaluation of past practices. Accordingly, firearms hearing transcripts and summaries like those at issue herein must *not*, as a general rule, be discoverable. Requests by plaintiffs for disclosure of such materials should be evaluated on a case-by-case basis to determine whether "exceptional circumstances" in a particular case would warrant discovery of firearms hearings documents. *See Bredice*, 50 F.R.D. at 250. Firearms hearings documents, in situations which are devoid

---

1. It can be said that this case, like *Davidson*, focuses upon one specific incident, that being the police officers' execution of the search warrant and the shooting of James H. Urseth. At the same time, however, this case is a civil rights action which alleges unconstitutional customs or policies adhered to by supervisory officials employed by the City of Dayton and adopted by the City itself. *See* Doc. #95, at 20–21. In that sense, the instant lawsuit is an attack on a course of conduct much more extensive than that which occurred during the October 7, 1983 raid.

of "exceptional circumstances," simply must be shielded from discovery, given the important function which they serve.

■ Plaintiff's memorandum in support of production of the Urseth Firearms Hearing transcript and Lt. Waymire's summary of the Committee's decision sets forth the type of "exceptional circumstances" which warrants disclosure of those otherwise protected materials (Doc. # 112). Apparently, there has already been public testimony about the Urseth Firearms Hearing by William P. Riley, former Deputy Director of the Dayton Police Department and a member of the Urseth Firearms Committee. Riley testified, during the state court criminal trial in 1985 of two of the individual Defendants in this case, that the Urseth Firearms Committee concluded that the shooting of Urseth was justified under department policy, that certain procedures had not been followed by the officers, and that discipline of the officers had been unanimously recommended by the Firearms Committee. (Doc. # 112, Exh. 1).

Plaintiff's request for pretrial disclosure of the Urseth Firearms Hearings documents takes on particular significance in light of Riley's testimony in open court. As there has already been public disclosure about the Firearms Hearing held in the matter of James H. Urseth, the chilling effect which would accompany the disclosure of *these* documents is reduced. Riley's testimony, moreover, puts into question the credibility of Dayton Police Chief Broomfield, a Defendant in this case. Chief Broomfield testified in his deposition, directly contrary to the testimony of Riley, that the Urseth Firearms Committee did *not* recommend discipline of the individual officers involved in the Urseth homicide. (Doc. # 112, Exh. 2). Only the documents which are currently before the Court will allow Plaintiff to pursue the issue of credi-

bility raised by these conflicting statements.

Riley's testimony, finally, bears upon the allegedly unconstitutional custom or practice, on the part of the Dayton Police Department and the City of Dayton, which Plaintiff hopes to prove at trial. Plaintiff has alleged that Defendant Broomfield either ratified a policy of violence and illegal searches, or that he knew that such conduct was occurring and that he failed to train his subordinates in order to avoid such unconstitutional conduct. A municipal custom or policy of such improper behavior is alleged to have been adopted by Defendant City of Dayton, based on the acts of supervisory officials such as Chief Broomfield. Given the fact that the police officers involved in the October 7, 1983 raid and shooting were not disciplined by Defendant Broomfield, Riley's testimony that discipline *was* recommended by the Firearms Hearing Committee underscores the critical nature of the Urseth Firearms Committee documents to the ratification or condonation of the allegedly unconstitutional conduct which Plaintiff seeks to establish in this case.

Based on the aforesaid, the Court concludes that both the Urseth Firearms Hearing transcript and Lt. Waymire's summary to Chief Broomfield of the recommendations of the Firearms Committee must be disclosed to Plaintiff, and that Defendant City of Dayton's pursuit of a protective order cannot be accommodated. The Court again emphasizes that this decision need not have a chilling effect on future Firearms Hearings held by the Dayton Police Department. Requests for production of firearms hearings transcripts and summaries of Firearms Committee recommendations will, in the future as in this case, be evaluated on a case-by-case basis.[2] Only

---

**2.** Defendant City of Dayton states in its Memorandum that "[t]o the extent that the additional documents requested by Plaintiff on the other officers on other shootings other than this particular shooting also contain Firearms Hearings, Defendants request that those hearings also be protected." (Doc. # 103 at 3). No other materi-

als pertaining to other firearms hearings have been submitted to this Court. While the instant decision and entry may provide guidance with respect to proper disclosure of other materials concerning firearms hearings, disclosure can only be considered on a case-by-case basis. Thus, the Court makes no express ruling as to

when "exceptional circumstances" are present, such as in the instant case, will production of such materials be ordered.

## C. SUMMARY

For the reasons enunciated in Parts A and B of this opinion, the three multi-page documents (Doc. # 104) tendered to this Court for *in camera* review should be produced to Plaintiff by Defendant City of Dayton. Defendant's request for a protective order (Doc. # 103) is overruled.

A conference among all counsel will be held, in this Court's Chambers, on Thursday, May 8, 1986, at 6:15 p.m., in order both to discuss certain housekeeping matters prior to trial and to begin the process of Court-monitored settlement discussions. This Court has every expectation that this case will proceed to trial on June 9, 1986, as scheduled.

DECISION AND ENTRY SUSTAINING, ON CONDITIONS SPECIFIED HEREIN, DEFENDANT CITY OF DAYTON'S MOTION TO COMPEL MEDICAL AUTHORIZATIONS (DOC. # 110); PLAINTIFF'S MOTION FOR PROTECTIVE ORDER PRESERVING PHYSICIAN–PATIENT PRIVILEGE SUSTAINED IN PART AND OVERRULED IN PART (DOC. # 113)

In its Motion to Compel Medical Authorizations, Defendant City of Dayton seeks an Order compelling Plaintiff to provide medical authorizations for the "complete medical records" of James H. Urseth, Plaintiff's decedent. (Doc. # 110). Defendant's position is that this discovery must be allowed in order for Defendants to properly prepare for Plaintiff's pendent wrongful death action in this Court. Plaintiff, the Administratrix of the estate of James H. Urseth, has responded with a Motion for Protective Order Preserving Physician-Patient Privilege. (Doc. # 113). Plaintiff claims that discovery of these records is improper given the physician-patient privilege of Ohio

whether firearms hearings documents other than those documents before the Court should

Revised Code 2317.02(B). In the alternative, Plaintiff seeks an Order from this Court indicating that any discovery of medical information with respect to James H. Urseth will not be considered a waiver by Plaintiff of the physician-patient privilege.

Central to this case is the physician-patient privilege, which is contained in Chapter 2317, the Ohio Revised Code's Chapter on Evidence. Section 2317.02 provides in pertinent part that:

> The following persons shall not testify in certain respects:
>
> (B) A physician concerning a communication made to him by his patient in that relation or his advice to his patient but the physician may testify by express consent of the patient or if the patient is deceased by the express consent of the surviving spouse or the executor or administrator of the estate of such deceased patient or if the patient voluntarily testifies the physician may be compelled to testify on the same subject, or if the patient, his executor or administrator, files a medical claim, as defined in division (D)(3) of Section 2305.11 of the Revised Code, such filing shall constitute a waiver of this privilege with regard to the care and treatment of which complaint is made ...

A "medical claim" as defined in Section 2305.11, refers to a malpractice action asserted against a physician, podiatrist, or hospital. The Ohio Supreme Court has indicated that waiver of the physician-patient privilege may only be made in the three express ways provided for in the statute. *State ex rel. Lambdin v. Brenton,* 21 Ohio St.2d 21, 254 N.E.2d 681 (1970). The mere *filing of a personal injury action,* for example, does not waive the physician-patient privilege. *Id.* at 24, 254 N.E.2d 681.

The text of Section 2317.02(B), its specific mention of the right of a surviving spouse or administratrix to waive the deceased patient's physician-patient privilege,

be produced to Plaintiff.

its inclusion in the general evidentiary section of the Ohio Revised Code, and its failure to specifically exempt wrongful death actions as it does medical malpractice actions from the scope of the statute, seems to indicate the applicability of this statute to wrongful death actions brought under Ohio Revised Code Section 2125.01, *et seq.* Defendant City of Dayton has not, in response to Plaintiff's invocation of the privilege with respect to her wrongful death action, provided this Court with any authority to the effect that this privilege is inapplicable to Plaintiff's wrongful death claim. Nor has this Court found any such authority as to the inapplicability of the privilege. Instead, Defendant City of Dayton relies primarily upon *Floyd v. Copas,* 9 Ohio Op.3d 298 (Montgomery Cty. CPC, 1977), *aff'd* 55 Ohio St.2d 27, 377 N.E.2d 794 (1978), as authority for its Motion to Compel pretrial disclosure of the "complete medical records" of James H. Urseth. This Court will concede the validity of the City of Dayton's basic premise that *Floyd v. Copas* is the most significant piece of legal writing since the Magna Carta. However, significant though it may be, the case simply has no applicability to the merits of Defendant City of Dayton's motion.

In *Floyd,* which involved a personal injury action, pretrial disclosure of plaintiff's privileged medical information was ordered, with defendants cautioned that such information could not be used at trial unless plaintiff waived the physician-patient privilege. Attractive as this holding might seem to Defendant City of Dayton, it must be noted that *Floyd* was decided on the basis of state procedural rules which have no bearing in this case. Ohio Rule of Civil Procedure 16(6) provides that an Ohio court may adopt pretrial procedures for the "exchange of medical records and hospital records." At the time of *Floyd,* the Montgomery County Common Pleas Court had specifically adopted such a rule, Local Rule 2.21(c), enabling a judge to order such exchanges of records. A reading of *Floyd* indicates the court's reliance upon these grants of authority in ordering pretrial disclosure of the medical records at issue. 9 Ohio Op.3d at 299–304. Federal Rule of Civil Procedure 16, on the other hand, has no provision for local pretrial procedures concerning the exchange of medical information, and there is no local rule comparable to the local rule relied upon in *Floyd.* Accordingly, *Floyd* is an insufficient as a basis for Defendant City of Dayton's Motion to Compel.[1]

■ Putting *Floyd* to one side, the Court turns to the tensions between the physician-patient privilege and the wrongful death action which Plaintiff has brought in this court. The purpose of the physician-patient privilege, which was not recognized at common law, is to encourage frankness and open communication between the patient and his or her physician. However, the policy which ostensibly underlies the privilege makes very little sense, so far as this Court is concerned, in the context of a lawsuit where a particular element of Plaintiff's claim turns on a physical or mental condition. *See* 4 Moore's Federal Practice § 26.60[6] at 26–222 (2d ed. 1948).[2] To

1. The Court notes that Federal Rule of Evidence 501 provides that, with respect to an element of a claim or defense in a civil action as to which state law supplies the rule of decision, privileges are to be determined in accordance with state law. Ohio Rule of Civil Procedure 16(6) is merely a procedural rule, rather than the source of an actual state law privilege. Ohio Rule of Civil Procedure 16, moreover, specifically notes that production by any party of medical or hospital records does not constitute a waiver of the physician-patient privilege.

2. In proposed Supreme Court Standard 504, which was struck by Congress, it was provided that the physician-patient privilege was waived as to "communications relevant to an issue of the mental or emotional condition of the patient in any proceeding in which he relies upon the death as an element of his claim or defense, or, after the patient's death, in any proceeding in which any party relies upon the condition as an element of his claim or defense." 2 J. Weinstein & M. Berger, Weinstein's Evidence, at 504–2. Senate Bill 335, currently pending before a committee of the Ohio Senate, provides that the filing of a civil action for the recovery of damages for personal injuries, or the filing of a worker's compensation claim, acts as a waiver of the physician-patient testimonial privilege. The filing of such a claim would also constitute

the extent that the privilege interferes with a defendant's ability to prepare for trial, or that it prevents the full airing of all of the relevant facts at trial in the event that the privilege is not specifically waived, there is considerable tension between the physician-patient privilege and the policies of fairness and full disclosure which govern federal litigation. As noted by the court in *Floyd* in the context of a personal injury action, "the court can conceive of nothing more unfair than for an injured plaintiff, concealing items under the guise of the physician-patient privilege, expressly waiving said privilege at trial by testimony which would, by catching the adversary unawares (the revelation being theretofore undisclosed and, perhaps unknown), effectively foreclose said adverse party from meaningful and effective cross examination." 9 Ohio Op.3d at 304.

In this Court's view, the theory behind the patient-physician privilege makes even less sense in a wrongful death action than it does in a personal injury case. The deceased, unfortunately, no longer has an ongoing relationship with his or her physician which might warrant the protection of the privilege. Ohio Revised Code Section 2125.02 provides, among other things, for damages turning on the loss of support and services of the decedent. This inquiry necessarily turns on a calculation of the decedent's physical condition at the time of the death which is alleged to have been caused by the defendant.[3]

Given the facts of this case, as well as the broader reasons sketched *supra*, this Court cannot accept Plaintiff's refusal to at least permit *discovery* by Defendants of her husband's medical records based on her invocation of the physician-patient privilege. In this case, at least one medical condition of Plaintiff's decedent appears to have itself played a role in his death.

Plaintiff does not controvert, in her Motion for Protective Order, Defendants' representation to the effect that Plaintiff intends to discuss her late husband's alleged loss of hearing and the role which it may have played in his shooting death. Under the uncontroverted scenario which has been presented to this Court, it might well have been that, had Plaintiff's decedent not suffered from some degree of hearing loss, he might have heard the shouts of "police" allegedly made by the individual Defendant police officers in this case as they undertook to execute their search warrant. Possibly, the course of conduct which James H. Urseth undertook, prior to his being shot by the entering police officers, might have been different had an alleged hearing loss not prevented him from hearing these entering cries by the Defendants. In other words, in this Court's view, Plaintiff's pursuit of a wrongful death action puts at issue all medical conditions which might themselves have contributed to cause the death of her husband.

The broader reasons as to the tensions between the physician-patient privilege and the bringing of a wrongful death action are also applicable herein. There is no dispute at all in this case that the individual Defendant police officers caused the death of Plaintiff's decedent. Plaintiff has indicated that she will introduce the expert testimony of an economist to establish the economic value, in dollar terms, of the loss which she has suffered due to the death of James H. Urseth. (Doc. # 88). One of the many assumptions of that document involves the life expectancy which James H. Urseth should have enjoyed. As the Court has already discussed, the permissible elements of compensation in a wrongful death action turn necessarily on the medical condition of Plaintiff's decedent prior to his death.

consent for purposes of discovery. 59 Ohio State Bar Association Report (May 5, 1986), at 702.

**3.** A defendant in a wrongful death action "has the right in mitigation of damages to show the age, weakness, diseased condition, impaired earning power or lack of activity of decedent or any other facts tending to prove that the decedent would have lived only a very short time had his death not been so accelerated." *Larrissey v. Truck Lines*, 155 Ohio St. 207, 98 N.E.2d 419 (Ohio 1951).

The Court notes that the Federal Rules of Civil Procedure contemplate full disclosure of the facts in order to allow the parties to fully prepare for trial. This Court recognizes, albeit reluctantly, that Plaintiff has not yet waived the physician-patient privilege which pertains to the medical records of James H. Urseth. Nonetheless, in this Court's view, and in the view of other federal courts which have faced the issue, disclosure of this privileged material prior to trial should be allowed in this case, given the policy of the federal rules and the high probability that Plaintiff will waive the physician-patient privilege at the trial upon her wrongful death action. *Parrett v. Ford Motor Company,* 47 F.R.D. 22, 24 (W.D.Mo.1968); *Burlage v. Haudenshield,* 42 F.R.D. 397, 398 (N.D. Iowa 1967); *Cf. Mariner v. Great Lakes Dredge and Dock Company,* 202 F.Supp. 430, 434 (N.D.Ohio 1962); *Awtry v. United States,* 27 F.R.D. 399, 402 (S.D.N.Y.1961).

For these reasons, Defendant City of Dayton's Motion to Compel Medical Authorization (Doc. # 110) is sustained. Plaintiff is ordered to execute the medical authorizations proffered, entitling Defendant City of Dayton to obtain disclosure of the medical records of James H. Urseth. Plaintiff's authorization of medical releases will not waive the physician-patient privilege which Plaintiff has claimed. The privileged matters obtained by means of these authorizations [4] shall be protected in the sense that they may not be introduced into evidence at the trial in this case until such time as Plaintiff has expressly waived the physician-patient privilege. *See* Ohio Revised Code Section 2317.02(B). Defendants are also precluded from using at trial on the merits any evidence gained pursuant to their discovery of this privileged medical

information until and unless Plaintiff expressly waives the physician-patient privilege. Additional protective conditions will also govern disclosure of this medical information. Inspection and access to the documents and materials produced shall be limited to Defendants' counsel and to such persons as may be employed by Defendants' counsel in connection with their preparation for trial on this matter. Defendants shall not disclose the contents of the documents received to any other persons other than those described, except by Order of this Court.

In summary, Defendant City of Dayton's Motion to Compel Medical Authorizations is sustained (Doc. # 110). As disclosure of this information to Defendants is not considered a waiver of the physician-patient privilege, as outlined above, Plaintiff's Motion for Protective Order preserving physician-patient privilege is sustained in part and overruled in part (Doc. # 113).

## DECISION AND ENTRY OVERRULING MOTION OF THE CITY OF DAYTON TO AMEND PROTECTIVE ORDER IMPOSED UPON FIREARMS HEARING DOCUMENTS (Doc. # 135)

■ On May 5, 1986, this Court ordered the City of Dayton to produce three multipage documents (Firearms Committee Documents) pertaining to the Firearms Committee Hearing held in the matter of James H. Urseth. This Court Order was made in the face of an objection by the City of Dayton which claimed that firearms hearings are and were intended to be the fora for critical self-analysis by the Dayton Police Department of the performance of its own officers and that, therefore, disclosure of Firearms Committee Documents would tend to chill the important self-criticism which is the aim of those hearings, all to

---

**4.** As Defendant City of Dayton has not provided the Court with copies of the medical release forms which it has forwarded to Plaintiff, the Court is uncertain as to exactly what types of records Defendant City of Dayton has attempted to obtain. Obviously, the Plaintiff's ability to claim the physician-patient privilege will turn in large part upon the types of records which Defendant City of Dayton hopes to pursue once it obtains the necessary medical authorizations

from Plaintiff. For example, the physician-patient privilege of Section 2317.02(B) has been construed as not extending to medical or hospital records, unless said records contain, in whole or in part, communications between the Plaintiff and physician, not in the presence of third parties, regarding diagnosis and treatment. *Pollitt v. Mobay Chemical Corporation,* 95 F.R.D. 101, 104 (S.D.Ohio 1982).

the detriment of the decision making processes of the Dayton Police Department and, ultimately, to the detriment of the public.

The Firearms Committee's mission was to examine three areas: (1) whether the shooting of James H. Urseth complied with the Firearms Policy of the Dayton Police Department; (2) whether the existing Firearms Policy required revision; and (3) whether additional training of Dayton police officers was required. The transcript of the Firearms Hearing reveals that the facts of the October 7, 1983 shooting were presented to the Committee members, and that a free-form, free-flowing discussion then ensued. This discussion allowed the Committee members to trade evaluations of police conduct on the date in question, and to determine whether remedial steps were necessary. The memorandum by Internal Affairs Commander C.E. Waymire to Chief Broomfield, after a brief summary of the facts, spells out in detail the Committee's answers to the three questions posed. It also puts forward comments and suggestions made by the Committee members, both collectively and individually.

In addition to ordering the City of Dayton to produce the three Firearms Committee Documents to the Plaintiff, the Court also imposed the following conditions, in the nature of a Protective Order:

Inspection and access to the Firearms Hearing Documents shall be limited to counsel for the parties and to such persons as may be employed by counsel for Plaintiff or Defendants in connection with their preparation for trial on this matter. No party in this case, whether Plaintiff or Defendant, shall *ever* (even should their participation in this case be terminated by settlement) disclose the contents of the three multi-page Firearms Hearing Documents to any other persons other than those described herein, except by Order of this Court.

Entry Amending Protective Order Imposed Upon Firearms Hearing Documents (Doc. # 120), filed May 9, 1986.

On May 19, 1986, the City of Dayton, undoubtedly in response—in whole or in part—to an editorial in the *Dayton Daily News* calling for the release of the hearing transcript in the *Urseth* case, filed a motion (Doc. # 135) seeking an Order of the Court amending the foregoing Protective Order to allow the City to disclose the results of the James H. Urseth Firearms Hearing.[1]

Neither the Plaintiff nor any of the other Defendants object to this motion of the City seeking an Order of the Court amending the foregoing Protective Order.

The editorial which precipitated the motion on the part of the City stated, in pertinent part, as follows:

One of the pivotal issues to emerge publicly involves a transcript of a hearing by a police board that reviewed the shooting. According to former deputy chief William Riley, the board, which reviews cases in which firearms have been used, unanimously recommended disciplinary action against the officers involved in the case.

Police Director Chief Tyree Broomfield, one of the Defendants in the suit, whose relations with Mr. Riley are bitter, has sworn that he received no such recommendation.

1. The City of Dayton's request to amend the Protective Order initially encompassed only the January 10, 1984, memorandum prepared by Lt. C.E. Waymire for Chief of Police Broomfield, summarizing the conclusions of the Firearms Committee after the Firearms Hearing held with respect to James H. Urseth. During a meeting between Court and counsel, held on May 20, 1986, counsel for the City of Dayton orally amended his request to include, in addition, the transcript of the November 11, 1983 Firearms Hearing held in the matter of James H. Urseth, with voting Firearms Committee members, Lt.

Col. W.P. Riley (Chair), Major D.E. Tobias and Lt. T.A. Tunney present. This Court's decision will encompass both documents, as well as a third to which the City voiced no strenuous objection to Court-ordered disclosure, to wit: a primarily factual (as opposed to self-evaluative) report labeled "Major D.E. Tobias/Firearms Hearing Board/James H. Urseth/November 11, 1983" which contains the Internal Affairs investigation into the shooting of James H. Urseth. The three documents shall be referred to collectively as the Firearms Committee Documents.

Federal District Court Judge Walter Rice, ... said the document [the transcript of the hearing by the Firearms Committee] was necessary in determining the validity of the Plaintiff's charge that Chief Broomfield ratified a policy of violence and illegal searches 'given the fact that the police officers involved in the Oct. 7, 1983, raid and shooting were not disciplined by Defendant Broomfield'.

....

If the case goes to court, the document presumably will be made public. However, if the case is settled out of court, it is possible that the contents of the transcript would not be revealed.

That possibility is unacceptable. The people of Dayton, especially, have a right to know what happened in the Police Department and who is telling the truth.

In its memorandum accompanying its motion seeking an Order of the Court amending the foregoing Protective Order, the City of Dayton stated, in pertinent part:

> ... Recent public statements calling into question Chief Broomfield's credibility require the disclosure of the firearms report. At this time, balancing the non-disclosure of the firearms report with the everyday functioning of the Dayton Police Department and the *credibility of its current supervisory personnel* requires disclosure as opposed to silence. Legitimate public interest may dictate disclosure at this time as opposed to the possibility of disclosure at the time of trial. (Emphasis added).

Memorandum in Support of Motion of City of Dayton to Amend Protective Order Imposed Upon Firearms Hearing Documents (Doc. # 135), pp. 1–2.

In its Decision and Entry which ordered the release of the Firearms Committee Documents to the Plaintiff, subject to the foregoing Protective Order, the Court stated, in pertinent part:

> Plaintiff's memorandum in support of production of the Urseth Firearms Hearing transcript and Lt. Waymire's summary of the Committee's decision sets forth the type of "exceptional circumstances" which warrants disclosure of those otherwise protected materials (Doc. # 112). Apparently, there has already been public testimony about the Urseth Firearms Hearing by William P. Riley, former Deputy Director of the Dayton Police Department and a member of the Urseth Firearms Committee. Riley testified, during the state court criminal trial in 1985 of two of the individual Defendants in this case, that the Urseth Firearms Committee concluded that the shooting of Urseth was justified under department policy, that certain procedures had not been followed by the officers, and that discipline of the officers had been unanimously recommended by the Firearms Committee. (Doc. # 112, Exh. 1). Plaintiff's request for pretrial disclosure of the Urseth Firearms Hearings documents takes on particular significance in light of Riley's testimony in open court. As there has already been public disclosure about the Firearms Hearing held in the matter of James H. Urseth, the chilling effect which would accompany the disclosure of *these* documents is reduced. Riley's testimony, moreover, puts into question the credibility of Dayton Police Chief Broomfield, a Defendant in this case. Chief Broomfield testified in his deposition, directly contrary to the testimony of Riley, that the Urseth Firearms Committee did *not* recommend discipline of the individual officers involved in the Urseth homicide. (Doc. # 112, Exh. 2). Only the documents which are currently before the Court will allow Plaintiff to pursue the issue of credibility raised by these conflicting statements. Riley's testimony, finally, bears upon the allegedly unconstitutional custom or practice, on the part of the Dayton Police Department and the City of Dayton, which Plaintiff hopes to prove at trial. Plaintiff has alleged that Defendant Broomfield either ratified a policy of violence and illegal searches, or that he knew that such conduct was occurring and that he failed to train his subordinates in order to avoid such unconstitutional conduct. A municipal custom or

policy of such improper behavior is alleged to have been adopted by Defendant City of Dayton, based on the acts of supervisory officials such as Chief Broomfield. Given the fact that the police officers involved in the October 7, 1983 raid and shooting were, not disciplined by Defendant Broomfield, Riley's testimony that discipline *was* recommended by the Firearms Hearing Committee underscores the critical nature of the Urseth Firearms Committee Documents to the ratification or condonation of the allegedly unconstitutional conduct which Plaintiff seeks to establish in this case.

Decision and Entry Ordering Disclosure of Documents Submitted by Defendant City of Dayton For *In Camera* Review (Doc. # 114), filed May 5, 1986, pp. 10–11.

No matter how admirable and sincere may be the City's motives and desires that the truth emerge in this case,[2] and no matter how legitimate the public interest may be in the information contained in the Firearms Committee Documents being made public, this Court is unable to grant the request that the documents be released at this time. The Urseth death and the resultant litigation has attracted a great deal of public comment and speculation. The trial of this lawsuit, set for June 9, 1986, is vitally important to its parties. It will also have a significant impact, potential and actual, upon the careers and reputations of many of the *dramatis personae*, the persons expected to testify as witnesses for the parties to the litigation. A case of this magnitude, of this significance, to the extent that this Court can control the situation, must not be and will not be tried in the news media. It will be tried in open Court where, consistent with the law and the rules of evidence and procedure, the truth—hopefully, the whole truth—will be revealed. To release the Firearms Committee Documents, which may themselves be offered as evidence at trial and which contain facts and opinions which may be proven to be highly relevant to the issues involved in this case, would be to create the possibility (yea, even the probability) that a fair trial could not be obtained for all parties, because information contained in the Firearms Committee Documents would be made public prior to the trial and undoubtedly taken out of context, distorted and sensationalized. Such publicity would further fan public controversy on this matter and render it much more difficult, by an unknown factor, to provide the fair trial that this community must have. This, the Court will not allow. No matter how legitimate the public interest is at this time in the publication of the Firearms Committee Documents, in order for the public to determine or to have confidence in the credibility of its current supervisory personnel, said legitimate public interest fades into insignificance when compared with the overwhelming public interest in a fair trial of this matter.[3]

2. This Court does not doubt the expressed sincerity of the City of Dayton in wanting the truth on this case to "come out." However, purely as a gratuitous aside, the undersigned finds himself mildly amused that the City of Dayton, perhaps at the suggestion of the Dayton Daily News Editorial Board, has come to this humble Court to aid it in allowing "[t]he people of Dayton ... to know what happened in the police department and who is telling the truth." After all, this is the same City of Dayton that recently paid a fee of some six figures to a Special Prosecutor, specifically hired and sworn to determine exactly "what happened in the Dayton Police Department and who [was] telling the truth" and to report his findings "to the people of Dayton." Without meaning to be overly presumptuous, the Court would suggest to the City of Dayton that one way to guarantee that the public will know the truth about its police department would be for the City to release the Special Prosecutor's report, bargained for and paid for with public funds. Such a suggestion assumes—of course—that the City has received such a report.

3. As counsel are aware, this Court's present plans are to empanel a jury in the city of Cincinnati, made up of citizens outside the Dayton media market, and to bus those citizens, on a daily basis, to trial in Dayton, as a means of attempting to insure the fairest trial possible. The Court emphasizes that these are its "present" plans. The vagaries of the financial cutbacks necessitated by the Gramm-Rudman Act may make such a plan financially infeasible, thus necessitating that a jury be drawn from the eight-county area served by this Court, counties

Should this case settle short of trial, this Court pledges its best efforts in working with the parties to assure that the documents in question will be made public in complete, unedited fashion.

WHEREFORE, based upon the aforesaid, this Court overrules the Motion of the City of Dayton seeking an Order of the Court amending the Protective Order imposed upon Firearms Hearings Documents.

which are very much within the ambit and

reach of the local news media.